UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| NNN SIENA OFFICE PARK I 2, LLC a Delaware limited liability company, et al., <br><br> Plaintiffs, <br><br> v. <br><br> WACHOVIA BANK NATIONAL ASSOCIATION, now known as WELLS FARGO BANK, NATIONAL ASSOCIATION, successor by merger, et al., <br><br> Defendants. | Case No. 2:12-cv-01524-MMD-PAL <br><br> ORDER <br><br> (Def.'s Motion for Summary Judgment – dkt. no. 72.) |

## I. SUMMARY

This case arises out of Defendant Wachovia Bank National Association's ("Wachovia")[1] loan to several investors for the purchase of tenancy-in-common ownership in a commercial property. Plaintiffs, a subset of tenancy-in-common investors, assert that in lending money for the purchase, Wachovia aided and abetted both common law fraud and securities fraud of the seller. Plaintiffs allege that Wachovia knew that the seller was intentionally misrepresenting and omitting facts about the property to induce Plaintiffs' investment, but failed to disclose this to Plaintiffs.

---

[1] Wells Fargo Bank, N.A. acquired Wachovia Bank National Association in 2008. Because the allegations in the complaint span from 2007 to 2012, some allegations pertain to actions taken by Wachovia while others involve actions taken solely by Wells Fargo. However, as the majority of acts complained of are in relation to Wachovia, the Court refers simply to that entity for simplicity.

Before the Court is Wachovia's Motion for Summary Judgment (dkt. no. 72) ("Motion"). The Court heard oral argument on August 28, 2014. Wachovia argues that the statute of limitations bars the fraud-based claims and that the evidence is insufficient to establish fraud. The Court agrees and grants the Motion.

## II. BACKGROUND

The following facts are undisputed.

### A. The Purchase

In January 2007, R.O.C.S.E.V. Capital, LLC ("ROCSEV") entered into an option contract for the purchase of two commercial properties in Henderson, Nevada ("the Property"). (Dkt. no. 72-1.) On April 3, 2007, ROCSEV entered into a purchase and sale agreement ("PSA") with Triple Net Properties, LLC ("TNP") under which ROCSEV agreed to acquire the Property under its option contract and sell the Property to TNP for $35,775,000.00. (Compl., dkt. no. 1, Exh. 1 ¶ 14; dkt. no. 72 at 5.[2]) Under the PSA, the parties agreed that $3,023,306.63 of the purchase price would be held in escrow to cover shortfalls in rental receipts from certain tenants of the Property as well as lost revenue and improvement costs resulting from another tenant's early termination (the "Holdback Funds"). (Dkt. no. 72-6 at 5.) After the PSA was executed, investors of ROCSEV's parent company filed several lis pendens on the Property relating to litigation involving ROCSEV, its parent company, and its controlling principal. (Dkt. no. 72-8 at 3-7.) As a result, the parties agreed to withhold an additional $300,000.00 of the purchase price in a separate escrow account (the "Litigation Holdback") to pay costs associated with resolving future legal disputes concerning the Property after closing.[3] (Dkt. no. 72-9 at 4.)

---

[2] Page numbers cited by the Court are those assigned by the ECF system.

[3] These lis pendens were required to be released as a condition of closing. (Dkt. no. 72-9 at 3.) Indeed, NNN Siena Office Park I, LLC terminated the original PSA due to ROCSEV's inability to obtain releases of the lis pendens by the closing date. (*See id.* at 2-3; dkt. no. 72-12 at 4.) Before the June 4, 2007, closing, all releases had been obtained. (*See* Dkt. no. 72-7 at 3.)

TNP subsequently assigned its rights under the PSA to NNN Siena Office Park I, LLC (the "Sponsor"), an entity TNP created to acquire the Property and solicit investors. (Dkt. no. 72 at 5; dkt. no. 82 at 5.) On June 4, 2007, ROCSEV exercised its purchase option and simultaneously sold the Property to the Sponsor and a group of investors as tenants in common ("First TIC Group"). (Dkt. no. 1 ¶ 29; dkt. no. 72 at 6-7.) Together with the Sponsor, the First TIC Group executed a non-recourse Promissory Note in favor of Wachovia for $28,620,000.00, secured by a Deed of Trust in the Property (the "Loan"). (Dkt. no. 1 ¶ 30; dkt. no. 72 at 7.) The Loan was structured to allow future investors to assume a portion of the loan obligation when they acquired their respective tenancy-in-common ("TIC") interests. (*See* dkt. no. 1 ¶ 34; dkt. no. 72 at 7.) Accordingly, on June 27, 2007, when a second group of investors acquired respective TIC interests in the Property, the investors assumed percentages of the First TIC Group's rights in the Property and obligations under the Loan ("Second TIC Group"). (*Id.*) On July 26, 2007, the third and final group of TIC investors acquired TIC interests in the Property ("Third TIC Group," collectively with the First and Second Groups, the "TIC Investors"). (Dkt. no. 1 ¶ 36; dkt. no. 72 at 7.)

### B.     The Investment

To solicit investments in the Property, the Sponsor created and disseminated a Confidential Private Placement Memorandum ("PPM") — and later an Addendum to the PPM — offering undivided TIC interests in the Property (the "Investment"). (Dkt. no. 72-2.) The Investment was offered as an unregistered security under the Regulation D exemption in the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa. (Dkt. no. 72-3 at 6.) Accordingly, the PPM specified that the Investment was available only to "accredited investors" as defined under Rule 501 of Regulation D — an individual who, in the most recent two years, had an individual annual income in excess of $200,000.00, or had a joint annual income with a spouse in excess of $300,000.00; an individual with a net worth exceeding $1,000,000.00; or a corporation or trust with total assets in excess of $5,000,000.00. (*Id.*)

The PPM outlined the potential risks of the investment and warned that the interest offered was highly speculative and that only those with substantial means and no need for liquidity in their investment should make the purchase. (*Id.* at 2, 6.) The PPM described the Holdback Funds, the risks those funds were designed to offset, the lis pendens, the risks associated with litigation involving the Property, and the Litigation Holdback. (*Id.* at 19.) As the transaction developed, the Sponsor updated investors about the transaction by issuing three supplements to the PPM. (Dkt. nos. 72-11, 72-12, 72-13.) Upon entering into the investment, each investor acknowledged (1) that the purchase included cash and an assumption of debt, (2) their obligation under the loan documents, and (3) their receipt, review, and understanding of the PPM, Addendum, and all attachments and exhibits thereto. (Dkt. no. 72-10.) Further, investors warranted that they were sophisticated real estate investors and were relying solely on their own investigations, inspections, and analyses of the Property, and not on any representation of the Sponsor. (*Id.* at 4.)

Additionally, as part of the Investment, the TIC Investors entered into a management agreement (the "Management Agreement") under which a subsidiary of TNP, Triple Net Properties Realty, Inc. ("TNPR"), was appointed property manager for the Property. (Dkt. no. 1 ¶ 38.) In December 2007, TNP merged with Grubb & Ellis Company ("G&E") and continued operating under G&E's name. (*Id.* ¶ 39; dkt. no. 72 at 11.) TNPR was renamed to Grubb & Ellis Realty Investors, LLC ("GERI"), and continued to manage the Property. (Dkt. no. 1 ¶ 39.)

### C. Actions Taking Place After the Investment

ROCSEV, the original seller of the Property, was a wholly owned subsidiary of Vescor LLC, whose principal was an individual named Val Southwick. (*Id.* ¶ 11; dkt. no. 72 at 5.) On February 6, 2008, the state of Utah charged Mr. Southwick with nine second-degree felonies for violating state securities laws. (Dkt. no. 1 ¶ 40; dkt. no. 72 at 10-11.) The same day, the SEC filed a civil suit against Mr. Southwick and several of his controlled entities, including Vescor LLC, for violating securities law by operating a Ponzi

scheme. (Dkt. no. 1 ¶ 41; dkt. no. 72 at 11.) Mr. Southwick pleaded guilty to the criminal charges on March 31, 2008. (Dkt. no. 1 ¶ 42; dkt. no. 72 at 11.)

In the SEC civil action, the U.S. District Court for the District of Utah appointed Robert Wing as receiver of the Southwick-related entities' assets (the "Receiver"). (Dkt. no. 1 ¶ 43; dkt. no. 72 at 11.) On June 8, 2008, the Receiver notified GERI of its claim that the Holdback Funds and Litigation Holdback belonged to the receivership estate as assets of Vescor LLC. (Dkt. no. 1 ¶ 44; dkt. no. 72 at 11.) The funds in the escrow accounts were frozen while the SEC investigated the Property's sale to the Sponsor. (Dkt. no. 1 ¶ 43; dkt. no. 72 at 11.) The freeze of the Holdback Funds diminished profits from the Property, and GERI notified the TIC Investors that it was necessary to reduce cash distributions. (Dkt. no. 1 ¶ 43; dkt. no. 72-18.) GERI retained counsel to contest the Receiver's claim and clarify ownership of the Holdback Funds. (Dkt. no. 1 ¶ 43.)

GERI discussed the legal dispute with the Receiver in its November 19, 2008, quarterly report to the TIC Investors. The report stated in pertinent part:

> Subsequent to the acquisition of Siena Office Park, the seller's principal, Val Southwick, was convicted of securities fraud and as a result, the Securities and Exchange Commission ordered that any assets or perceived assets of Val Southwick be temporarily frozen pending further investigation by a court ordered receivership. At the time of purchase, Grubb & Ellis Realty Investors, LLC and seller, R.O.C.S.E.V. LLC (an entity affiliated with Val Southwick), entered into an escrow agreement whereby an escrow agent would release portions of the escrow money for rental revenue and tenant improvement and leasing commission costs related to leases with Apex and HQ. The Apex holdback total is $139,772 and the HQ balance is $2,745,711. Since Val Southwick is affiliated with R.O.C.S.E.V. LLC, the SEC temporarily froze this escrow account pending review of the escrow agreement and the purchase and sale transaction. We are confident that once the SEC receivership reviews this matter, the escrow funds will be made available as this escrow account is not related to Mr. Southwick's securities fraud. We have hired a national law firm to pursue legal remedies to expedite the release of these funds and we are currently in a period of discovery where the receivership is reviewing our files. The court has informed us that this review may take us well into 2009. Our legal team is working closely with our outside counsel to resolve this matter as quickly as possible and we will keep the investors apprised on the progress of this situation.

(Dkt. no. 72-17.)

///

5

The Receiver eventually began an investigation into the Investment transaction and filed suit against GERI on July 6, 2009, alleging that the Property was fraudulently transferred in continuation of Mr. Southwick's Ponzi scheme (the "Receiver Action"). (Dkt. no. 1 ¶ 47.) The Receiver asserted rights to the Holdback Funds and the Property itself. (Dkt. no. 1 ¶ 47; dkt. no. 82 at 7.) The Receiver action was ultimately resolved through settlement.

### D. Procedural History

Plaintiffs, a subset of the TIC Investors, filed this lawsuit on July 20, 2012, against Wachovia, Stewart Title Company (the escrow company involved in the transaction), and Holland & Hart LLP (the law firm GERI retained in the Receiver Action).[4] (Dkt. no. 1.) The Court dismissed Plaintiffs' third cause of action against Wachovia for unauthorized mortgage banker activity. (Dkt. no. 47.) Additionally, Plaintiffs conceded at oral argument that the evidence does not support their claim for breach of the covenant of good faith and fair dealing.[5] The Court will therefore address Wachovia's arguments only as to the remaining claims.

## III. DISCUSSION

### A. Legal Standard

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is

---

[4] Plaintiffs stipulated to dismiss without prejudice their claims against Stewart Title Company. (Dkt. no. 35.) Holland & Hart, LLP has filed a separate Motion for Summary Judgment as to the claims against it. (Dkt. no. 86.)

[5] The Court directed the parties to file a stipulation and order for dismissal of the fourth claim for relief against Wachovia.

"material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (*quoting First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

///

///

**B.   Analysis**

      **1.   Authentication of Evidence**

Plaintiffs object to Wachovia's proffered evidence because Wachovia failed to include any declaration authenticating, laying foundation, or certifying the documents as true and correct copies. Wachovia's attachments include the Investment transaction's forming and ancillary documents, communications (letters, emails, and reports) between the TIC Investors and the property manager, a legal complaint, interrogatory answers, deposition transcripts, and Plaintiffs' experts' reports. Because these documents provide the evidentiary basis for Wachovia's Motion, Plaintiffs argue that their lack of authentication is fatal to the Motion.

The Ninth Circuit Court of Appeals has "made clear that 'unauthenticated documents cannot be considered in a motion for summary judgment.'" *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011) (*quoting Orr*, 285 F.3d at 733). To authenticate a document, the proponent must offer "'evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *Id.* at 532-33 (*quoting* Fed. R. Evid. 901(a)). As the summary judgment procedure is the pretrial functional equivalent of a directed-verdict motion, it requires consideration of the same caliber of evidence that would be admitted at trial. *Anderson*, 477 U.S. at 251 (*citing Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 745 n.11 (1983)). Thus, it is insufficient for a litigant to attach a document to a summary judgment motion or opposition without affirmatively demonstrating its authenticity.

However, the absence of a declaration does not necessarily equate with a failure to authenticate. Wachovia's evidence includes numerous deposition transcripts, which do not require a declaration for authentication.[6] Rather, deposition transcripts are authenticated when the transcript "identifies the names of the deponent and the action

///

---

[6] Indeed, such a declaration would be insufficient to authenticate a deposition transcript. *See Orr*, 285 F.3d at 774.

8

1  and includes the reporter's certification that the deposition is a true record of the
2  testimony of the deponent." *Orr*, 285 F.3d at 774. The deposition transcripts Wachovia
3  presents identify the names of the deponents and this action. The transcripts lack the
4  reporter's certification; however, Wachovia has cured this defect by attaching the
5  certificates as an exhibit to its reply brief. (Dkt. no. 87-3.) Although this method of
6  certification is not preferred, Wachovia includes all the elements required to support a
7  finding that the deposition transcripts are what they purport to be, and the Court finds
8  that there is not an authentication problem.

9  Wachovia's remaining exhibits are documents Plaintiffs produced in discovery.
10 Documents produced by a party-opponent in discovery are deemed authentic. *In re*
11 *Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769, 781 (C.D. Cal. 2004) (*citing Orr*,
12 285 F.3d at 777 n.20). With its Motion, Wachovia includes its counsel's declaration,
13 which attests to the fact that Plaintiffs produced the remaining exhibits during discovery.
14 (Dkt. no. 87-5.) Additionally, Plaintiffs have not substantively challenged the documents'
15 authenticity, or asserted that they are not the documents they provided as part of
16 discovery. Further, Plaintiffs raised no authenticity argument at the August 28, 2014,
17 hearing. The Court therefore finds that the documents are properly authenticated.

18 **2.     Fraud Based Claims**

19 The claims remaining against Wachovia are those for (1) aiding and abetting
20 securities fraud, (2) aiding and abetting common law fraud, and (3) declaratory relief with
21 respect to the loan documents. Because the fraud-based claims will affect any
22 declaration of the parties' rights and responsibilities under the loan documents, the Court
23 focuses solely on those claims.

24 At the hearing on August 28, 2014, Plaintiffs clarified that they were not pursuing
25 the allegations in the Complaint relating to Wachovia's involvement in preparing the PPM
26 and the appraisal report because discovery did not support these allegations. Plaintiffs
27 further clarified that the Sponsor defrauded them by not disclosing its association with
28 the Southwick scheme and the high risk of future litigation involving the Property

1  resulting from that association. In light of these clarifications, Plaintiff now argues that
2  Wachovia aided and abetted in the fraud by financing and structuring the Loan to allow
3  the sale of TIC interests after closing, and by failing to disclose the high risk of litigation
4  involving the Property. The Court finds that the undisputed evidence establishes that
5  Plaintiffs were on inquiry notice and should have known of the alleged fraud, and
6  Wachovia's involvement, at the time of the transaction or by November 19, 2008, when
7  they received GERI's quarterly report.

8  The same statute of limitations applies to an aiding and abetting claim and the
9  underlying fraud. *See USACM Liquidating Trust v. Deloitte & Touche LLP*, 764 F. Supp.
10 2d 1210, 1231 (D. Nev. 2011) (applying a three-year statute of limitations for aiding and
11 abetting a breach of fiduciary duties). The parties agree that the applicable statute of
12 limitations on a fraud claim is three (3) years from the date plaintiff discovered, or should
13 have discovered through the exercise of proper diligence, the facts concerning the
14 alleged fraud. NRS § 11.190(3)(d); *Howard v. Howard*, 239 P.2d 584, 589 (Nev. 1952).
15 Securities fraud claims are subject to a different limitations period. Actions based on
16 violations of NRS § 90.660 must be commenced within the earliest of "2 years after the
17 discovery of the violation, 2 years after discovery should have been made by the
18 exercise of reasonable care, or 5 years after the act, omission or transaction constituting
19 the violation." NRS § 90.670.

20 The limitations period accrues when the plaintiff discovered or should have
21 learned of facts constituting all of the elements of the claim. *Siragusa v. Brown*, 971 P.2d
22 801, 807 (Nev. 1998). "[T]he question of when a claimant discovered or should have
23 discovered the facts constituting a cause of action is one of fact." *Id.* at 812 (*citing Oak
24 Grove Investors v. Bell & Gossett Co.*, 668 P.2d 1075, 1079 (Nev. 1983)).

25 Plaintiffs are correct that a jury typically determines when a statute of limitations
26 began to run because the facts involved in the determination are often "susceptible to
27 opposing inferences." *Millspaugh v. Millspaugh*, 611 P.2d 201, 448-49 (Nev. 1980).
28 However, "where uncontroverted evidence proves that the plaintiff discovered or should

have discovered the facts giving rise to the claim," the beginning of the limitations period may be determined as a matter of law and summary judgment may be appropriate. *Siragusa*, 971 P.2d at 812.

The undisputed evidence establishes that Plaintiffs should have known of the Sponsor's fraud in November 2008 at the latest. As noted above, Plaintiffs allege that the Sponsor's fraud was its failure to disclose its association with the Southwick scheme and the related risk of future litigation. The November 19, 2008, quarterly report from GERI to Plaintiffs discussed the Southwick scheme and its connection to the Property. (Dkt. no. 72-17.) In particular, the report explained that Mr. Southwick was convicted of securities fraud and, as a result, the SEC had placed a temporary freeze on assets associated with him. (*Id.*) The report further explained that "the SEC temporarily froze this escrow account [the Holdback Funds] pending review of the escrow agreement and the purchase and sale transaction." (*Id.*) At a minimum, these disclosures should have placed Plaintiffs on inquiry notice of the Sponsor's association with Mr. Southwick and his scheme. Moreover, the November 19, 2008, quarterly report informed Plaintiffs of the *materialization* of the risk of future litigation.[7] Plaintiffs thus should have discovered all elements of the fraud by at least November 2008.

Plaintiffs aver that Wachovia substantially assisted in the Sponsor's fraud by "providing financing for the purchase of Plaintiffs' respective TIC interests in the Property, and structuring the Loan [in] such a way as to allow the sale of TIC interests in the Property to take place after closing." Plaintiffs, however, acknowledge that there was nothing fraudulent about the financing or financial structure of the Investment transaction. Moreover, the PPMs and the transactional documents disclosed Wachovia's

///

---

[7]Plaintiffs contend that the quarterly report was insufficient to put them on notice of the alleged fraud because the report was too optimistic in forecasting the outcome of the litigation. However, regardless of report's tone concerning the litigation, Plaintiffs cannot assert that they were still unaware of the alleged fraud when the undisclosed risk caused by the alleged fraud had actually materialized.

financing and the loan structure. Thus, Plaintiffs knew of Wachovia's role in the financing and the financial structure of the Investment at the time of the transaction.

Plaintiffs' allegations that Wachovia failed to disclose information about the heightened risk of future litigation are belied by the fact that Plaintiffs had access to the same information. In alleging that Wachovia knew about the Sponsor's fraud and the related risk of future litigation, Plaintiffs rely on Wachovia's knowledge of, and investigation into, the lawsuits underlying the lis pendens. But this information was equally available to Plaintiffs — it is undisputed that the PPM and supplements notified all potential investors of the lis pendens and Litigation Holdback before any investor entered into the transaction.[8] (*See* dkt. nos. 72-2, 72-11, 72-13.) If the information contained in the PPM and supplements' disclosures was insufficient to put Plaintiffs on inquiry notice of the heightened risk of future litigation, the Court cannot conclude that Wachovia's failure to disclose essentially the same information amounts to aiding and abetting fraud.

Plaintiffs attempt to raise a question of material fact about the limitations period by arguing that they were unaware of Wachovia's knowledge of the Sponsor's fraud until 2011, when an email chain between the Sponsor and Wachovia was produced in discovery of a separate lawsuit. Plaintiffs suggest that even if they should have been aware of the *Sponsor's* fraud either at the time of the transaction or when notified of the SEC action, their lack of knowledge of Wachovia's role negates an element of the aiding and abetting claim, thus delaying the start of the limitations period. However, the email chain Plaintiffs produce simply establishes that Wachovia had knowledge of the lis pendens and Litigation Holdback, not the Sponsor's alleged fraud. (Dkt. no. 82-24.) The

---

[8]Plaintiffs contend Wachovia had greater information because it had access to the Seller's name and the PSA, which listed the legal actions pending against the Property and included details like the case number. However, Plaintiffs concede that they could have requested this information from the Sponsor. (Dkt. no. 107.) Moreover, this information would also be contained in county property records, which a purchaser of real property is presumed to know as a matter of law. *See* NRS § 247.190(1); *In re Crystal Cascades Civil, LLC*, 398 B.R. 23, 29 (Bankr. D. Nev. 2008).

same information — existences of the lis pendens and Litigation Holdback — was also disclosed to Plaintiffs in the PPMs and supplements at the time of the transaction

In sum, the disputed evidence shows that Plaintiffs knew or should have known of the alleged fraud, and Wachovia's involvement, at the time of the transaction or by November 19, 2008, when they received GERI's quarterly report. Plaintiffs' fraud based claims are therefore barred by the three (3) year statute of limitations.

**III.    CONCLUSION**

It is therefore ordered that Defendant Wachovia's Motion for Summary Judgment (dkt. no. 72) is granted. The Clerk of the Court is instructed to enter judgment in favor of Defendant Wachovia Bank National Association.

DATED THIS 8th day of September 2014.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE